**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**YOLANDA R. TEPPER,**

**Plaintiff,**

**-vs-**                                                  **Case No.  6:04-cv-1257-Orl-31DAB**

**RICHARD A. CANIZARO and DONALD**
**ESLINGER, Sheriff of Seminole County,**

**Defendants.**

_____

# ORDER

In this case the Plaintiff, Yolanda Tepper ("Tepper"),[1] has sued the Defendants, Richard

Canizaro ("Canizaro") and Donald Eslinger ("Eslinger") (collectively referred to, where

appropriate, with Canizaro, as the "Defendants"), under both 42 U.S.C. section 1983 ("Section

1983") and state law, alleging that she was injured during an incident that occurred in a courtroom

in the Juvenile Justice Center in Seminole County, Florida.  This matter is presently before the

Court on the Defendants' Motion for Summary Judgment (Doc. 24), and Tepper's Opposition

thereto (Doc. 36).[2]  For the reasons stated herein, the Defendants' motion is denied.

**I.      Background**

A. Parties

Tepper is a resident of Orlando, Florida.  At the time of this incident, she resided in

Casselberry, Florida.

_____

[1] When this case was originally filed, Tepper's husband, Robert Tepper, was included as a
plaintiff, and he asserted a claim for a loss of consortium in relation to this incident.  (*See* Doc. 2).
However, Robert Tepper's only claim was subsequently dismissed.  (Doc. 35).

[2] Tepper's Complaint appears at Doc. 2.

Canizaro is a deputy employed by Eslinger, who is the sheriff of Seminole County, Florida. At the time of this incident, Canizaro was a courthouse deputy, assigned to work for Judge Dickey in Courtroom 1 of the Juvenile Justice Center (the "JJC").

B. Facts

On July 25, 2003, Tepper was at the JJC to attend a hearing for her son, Sean Tepper.[3] (Doc. 25, Att. 7 at 96).  When the name "Tepper" was announced, Tepper approached the podium in the courtroom.  (*Id.*).  As Tepper stood at the podium, the judge stated that her son was charged with assaulting an officer.  (*Id.* at 97).  Tepper disagreed, and stated that her son did not assault an officer.  (*Id.*).  The judge then asked if she was present when the incident with her son occurred, and she indicated that she was not.  (*Id.* at 97-98).  The judge then indicated that her opinion regarding the event was not at issue in that hearing.  (Doc. 31).[4]  Tepper continued to try explain that her son did not assault an officer and that he needed certain medicine.  (*Id.*).  Throughout this incident, Tepper did not raise her voice and appeared to speak and act calmly.  While Tepper was engaged in this exchange with the judge, Canizaro was already standing several feet behind her. (*Id.*).

At 10:03:45,[5] while Tepper was speaking to the judge, the judge ordered her to go outside before he held her in contempt.[6]  (Doc. 31).  Tepper asked if she could say something.  (*Id.*).

---

[3] Although it is not clear from the record, this hearing appears to have been an arraignment.

[4] Doc. 31 is a video recording of this incident.

[5] This time is based on the timer that appears on the video.  For example, here it appears that the time was 10:03 a.m. and 45 seconds.

[6] Canizaro asserts that the judge told Tepper to leave several times.  (*See* Doc. 37 at 17, 22, 46).  This assertion is not supported by the video evidence.  (*See* Doc. 31).

Within less than two seconds, at approximately 10:03:46 or 10:03:47, Canizaro approached

Tepper and touched her for the first time.[7]   (*Id*.; *see also* Doc. 25, Att. 7 at 99 (Tepper states that

she "felt Mr. Canizaro grab -- I just felt someone grab me right here on my arm.")).   He began to

approach her while the judge was speaking, and appeared to be touching her while the judge was

still speaking.   (Doc. 31).   The judge neither asked nor ordered Canizaro to escort Tepper out of

the courtroom.   (Doc. 31; Doc. 37 at 23).   Canizaro placed his hand on Tepper's right arm and

pushed her.[8]   (Doc. 31).   At that time, Tepper was attempting to collect and pick up certain

documents and other items that she had placed on the podium.   (*Id*.).   Canizaro appeared to have

his hand on Tepper while she did this.   (*Id*.).   Almost immediately, Canizaro picked up the

remaining items on the podium and handed them to Tepper.   (*Id*.).   At this point, Tepper, who did

not appear to have had time to collect her belongings, looked as if she was leaving, and turned to

get the remainder of her items.   (*Id*.).   With Canizaro still touching her, at 10:03:53, she stated,

"OK, I'm going to go. I'm going to leave. You don't have to grab me, officer."   (*Id*.).   At this

point, Tepper was still trying to collect her belongings.[9]   (*Id*.).   Canizaro had not specifically

---

[7] Canizaro states, however, that in order to go "hands on" with a civilian, the civilian has to be refusing an order or resisting in some way.   (Doc. 37 at 23).

[8] Canizaro states that he waited to first touch Tepper until after the judge had instructed her several times to leave, and after he also instructed her to leave and determined that she was not leaving.   (Doc. 37 at 17).   These assertions are not supported by the video evidence.   (*See* Doc. 31).

[9] Canizaro states that he does not believe she was actually leaving, but that she was "stalling." (Doc. 37 at 19, 22).   He also indicates that he believes she had "plenty of time to leave," and that she should have left after the first order to leave.   (*Id*.).   In addition, he states that while Tepper was attempting to collect her things, he "offered" to get them for her.   (*Id*. at 22).   At no point in the video does Canizaro make such an offer.   (*See* Doc. 31).   Indeed, it appears that Canizaro was rushing her and did not give her the opportunity to collect her things by herself.

ordered her to leave at this point.  (*Id*.).  Instead, he only said, "ma'am," (at 10:03:48), "ma'am, let's go," (at 10:03:50), "let's go," (at 10:03:54).  (*Id*.).  At 10:03:58, within thirteen seconds of the time the judge told Tepper to leave, Canizaro grabbed Tepper's right arm and began to propel her toward the courtroom door.  (*Id*.).

As Canizaro held her arm and began pushing her, Tepper stopped walking and told him that he was hurting her.[10]  (*Id*.).  At this point, Canizaro released her arm.  (*Id*.).  Although Tepper moved her right arm at the same time, it does not appear that she was either acting aggressively or resisting Canizaro's efforts.[11]  (*Id*.).  Canizaro immediately placed his left hand on her back and began pushing her sideways toward the courtroom door.  (*Id*.).  As he was pushing her, he told her that he wanted her to leave.[12]  (*Id*.).  Tepper again stated, while she was being pushed sideways toward the door, that he was hurting her.  (*Id*.).  It then appears that Canizaro placed both hands on her and continued to push her in such a manner that she was turned around almost facing him, such that she was moving backwards toward the door.[13]  (*Id*.).  Tepper again stated that Canizaro

---

[10] Canizaro does not believe that he was hurting Tepper, because he does not think his grip was too hard, nor was it a "pain compliance kind of touch."  (Doc. 37 at 17).

[11] Canizaro reports that Tepper did not leave the courtroom until he "secured her arm with a custodial touch."  (Doc. 37 at 17).  However, he also reports that at the time he touched her, she physically resisted him by pulling her arm away.  (*Id*.).  He also describes her movement as "yank[ing] away from" him and breaking his grip by pulling away.  (*Id*. at 18, 19).  It is at this point, Canizaro asserts, that Tepper physically refused to leave the courtroom.  (*Id*. at 20).

[12] Tepper was being taken out of the courtroom at this point, Canizaro asserts, because she had already physically refused to leave.  (Doc. 37 at 20).

[13] Canizaro states that after he the first touch, he "secured" Tepper again with both hands, and walked to the "end of the courtroom" with both hands on her.  (Doc. 37 at 19-20).

was hurting her, and while she was speaking, as she was being pushed backwards, at 10:04:03 she

fell backwards against the courtroom door and onto the floor.  (*Id*.).[14]

Tepper described the incident as follows:

> He grabbed me by my right arm firmly, and I immediately felt pain when he
> grabbed my arm.  And I raised my right arm and I said, "Officer you don't have to
> do this, I'm going to leave peacefully."  And Mr. Canizaro just ignored what I had
> said and he just kept on yanking my shoulder, pulling me backwards, grabbing me
> tight in his grip even harder.  And I said, "You're hurting me."  And he just
> tightened it more, and I said, "You're hurting me," and he just kept on tightening
> his grip and just was pulling my arm backward -- was killing me, hurting me. . . . I
> remember, like, he was pulling me all the way to the back of the room, and I
> remember feeling his hands on my breasts, and I just -- he pushed me into the
> ground. . . . I was being pulled backwards, so I couldn't see how close I was to the
> door.  But when I fell and I hit the door and I hit -- I hit the door, my head hit the
> door.  When I fell, I guess I realized I was by the door.

(Doc. 25, Att. 7 at 100-101).[15]

After several moments, as Canizaro stood over Tepper, she stated that she had high blood

pressure, that her blood pressure "[was] up," and that she was dizzy.  (Doc. 31).  Then, through a

combination of her own efforts and Canizaro's assistance, she stood, and he escorted her out the

door.[16]  (*Id*.).  While she was standing and walking out the door, she immediately renewed her

---

[14] Canizaro denies pushing or shoving Tepper to the ground.  (Doc. 37 at 26-27).  Instead, he
states that he was trying to get her out of the courtroom by escorting her out, and that she was resisting
by pulling away from him and trying to turn around, which is when she fell.  (*Id*. at 26).  He states that
she fell as a result of her "own action," because she was turning around and both of them were moving
"at a high rate of speed."  (*Id*. at 27, 40).

[15] Tepper believes that Canizaro pushed her breasts and pushed her to the ground on purpose.
(Doc. 25, Att. 7 at 102).  She states that she did not trip or lose her balance.  (*Id*. at 104).

[16] *See* Doc. 25, Att. 7 at 102-104, where Tepper states:

> I was stunned.  I don't remember a whole long -- I remember feeling pains in my neck.
> My neck had twisted a little bit between the place where the people sit where the chairs

attempts to explain her son's situation.  (*Id*.).  Tepper states that Canizaro later apologized several

times for pushing her, saying that he did not mean to do so.[17]  (Doc. 25, Att. 7 at 104, 107).

Tepper was then transported via stretcher to an ambulance, and brought to a hospital,

where x-rays were taken and a CT scan was performed.  (Doc. 25, Att. 7 at 106-107).  After being

treated at the hospital, Tepper was arrested and charged with resisting an officer (obstructing)

without violence.[18]  (Doc. 37 at 32-33).  This charge was subsequently reduced to disorderly

conduct under Florida Statute section 877.03.  (*Id*. at 33; Doc. 25, Att. 3, Ex. E).  At a trial, Tepper

was found not guilty of disorderly conduct.  (Doc. 25, Att. 3, Ex. F; *Id*. at Ex. G at 7; Doc. 37 at

34).

Tepper suffers from bi-polar disorder, and states that as a result of being pushed down, she

experienced a "real down episode."  (Doc. 25, Att. 7 at 108).  When she fell, she hit her head, and

upper and lower back, in which areas she immediately felt pain.  (Doc. 25, Att. 3, Ex. G at 5).  She

states that: (1) MRIs taken after this incident show that the conditions in her spine, neck and hip

have gotten worse; (2) these injuries have caused her "more pain than [she] can bear;" (3) she has

─────────────────

were, and the back of my head was killing me.  And I opened my eyes.  I felt my blood
pressure going up. . . . But Canizaro wouldn't let go and just kept on pulling me.  And
then he just pushed me. . . . I remember someone took me outside.  I think it was
Canizaro and he threw me down on a chair.

[17] Canizaro denies ever apologizing.  (Doc. 37 at 27, 41-42).

[18] The arrest was made under Florida Statute section 843.02.  (Doc. 24, Att. 2, Ex. A). Canizaro
decided to arrest Tepper at the point where she initially "resisted" him, when she pulled away from
him.  (Doc. 37 at 32).  At that point, the charge would have been resisting an officer without violence.
(*Id*. at 32-33).  He believes this would have been appropriate because he "gave her a lawful order to
leave the courtroom, which [he] felt she didn't do it so at that point [he] went to go hands on and she
resisted."  (*Id*. at 33).  He states that she disobeyed orders from both the judge and from himself.  (*Id*.
at 38).

been unable to work because of that pain; (4) she has needed increased amounts of pain medication and pain treatment due to being pushed down; (5) this increase in pain medication has caused her blood pressure to increase; and (6) she suffers from "weakness, terrible pain and spasms in [her] back and leg."  (*Id*. at 5, 7).[19]

Canizaro was not disciplined as a result of this incident.  (Doc. 37 at 16).  His actions were reviewed by four separate superior officers, all of whom either agreed with Canizaro's actions or concluded that his use of force was justified.  (Doc. 25, Att. 2, Ex. B at 2).

C. Claims and Arguments

As a result of this incident, Tepper has filed claims against Canizaro for battery (Count I) and for the excessive use of force and wrongful arrest in violation of her Fourth Amendment Rights (Count III).  She has also asserted, in Count II, that Eslinger is vicariously liable, as Canizaro's employer, for Canizaro's actions.

Canizaro asserts that he is entitled to summary judgment on Count III on the grounds of absolute quasi-judicial immunity because he acted pursuant to a judicial order,[20] or on the grounds

---

[19] Dr. James Shea was unable to state whether Tepper suffered a traumatic injury during her fall, nor was he involved in any objective studies to determine whether she suffered injuries during that fall.  (Doc. 38 at 56-57, 46).

[20] Normally, "law enforcement personnel, acting in furtherance of their official duties and relying on a facially valid court order, are entitled to absolute quasi-judicial immunity from suit in a section 1983 action."  *Roland v. Phillips*, 19 F.3d 552, 556 (11th Cir. 1994) ("When an official acts pursuant to a direct judicial order, absolute quasi-judicial immunity is obvious."); *see also Martin v. Hendren*, 127 F.3d 720, 721 (8th Cir. 1997) ("bailiffs enjoy absolute quasi-judicial immunity for actions specifically ordered by the trial judge and related to the judicial function") (internal citation and quotation omitted) .  This doctrine exists because "[l]aw enforcement officials must not be called upon to answer for the legality of decisions which they are powerless to control or be required to act as pseudo-appellate courts scrutinizing the orders of judges."  *Mauldin v. Burnette*, 89 F. Supp. 2d 1371, 1379 (M.D. Ga. 2000) (internal citation and quotation omitted); *see also Nicholson v. Moates*,

of qualified immunity because he applied only *de minimus* force and had probable cause to arrest

Tepper.  Canizaro also seeks summary judgment on Count I on the grounds that he is entitled to

statutory immunity under Florida Statute section 768.28(9) and that the force used was not clearly

excessive under the circumstances.  Eslinger asserts that he is entitled to summary judgment on

Count II because Canizaro's actions were not unlawful.

## II.      Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine

issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d

454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to

the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the

burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929

F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347,

1352 (M.D. Fla. 2003).

---

159 F. Supp.2d 1336, 1343 (M.D. Ala. 2001) ("The rationale is that officials assigned to carry out
judge's orders can perform their function without the need to secure permanent legal counsel.").  It
is irrelevant for the purposes of this analysis "whether the order at issue is written or verbal."
*Mauldin*, 89 F. Supp. 2d at 1380.  The Court rejects Canizaro's quasi-judicial immunity argument,
because there is no evidence that the judge ever asked or ordered Canizaro to remove Tepper from the
courtroom. (*See* Doc. 31).  Indeed, Canizaro admits that the judge did not do so.  (Doc. 37 at 23).  The
cases Canizaro cites are not to the contrary, because in each of those cases, the law enforcement
official in question was acting pursuant to a specific command from a judge.  *See Martin*, 127 F.3d
at 721 (defendant subdued plaintiff in courtroom, while "obeying specific judicial commands to
restore order in the courtroom" and "was carrying out a judicial command in the judge's courtroom
and presence"); *Valdez v. City and County of Denver*, 878 F.2d 1285, 1290 (10th Cir. 1989)
(dismissing allegations on ground of absolute immunity where actions by officials were taken under
direction of judge); *Richman v. Sheahan*, 270 F.3d 430, 436 (7th Cir. 2001) (recognizing "immunity
for law enforcement officials when the challenged conduct . . . was specifically ordered by the judge").

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).[21]

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

## III.   Qualified Immunity

Qualified immunity insulates government officials from personal liability in Section 1983 cases for actions taken pursuant to their discretionary authority. *Cooper v. Dillon*, 403 F.3d 1208,

---

[21] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

1220 (11th Cir. 2005).  Such officials "generally are shielded from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982);

*Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  The government official's actions are thus

judged by the objective legal reasonableness of those actions.  *Anderson*, 483 U.S. at 639.  Thus,

qualified immunity "protects all but the plainly incompetent or those who knowingly violate the

law."  *McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir. 1995) (internal citation and quotation

omitted); *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (analysis looks at

"official's objective reasonableness, regardless of his underlying intent or motivation.").  Where

reasonable officials could differ as to the lawfulness of the defendant official's actions, the

defendant is entitled to immunity.  *Kingsland*, 382 F.3d at 1231.

        The Eleventh Circuit has established a two-part analysis for qualified immunity cases.

First, the defendant government official must "prove that he was acting within the scope of his

discretionary authority when the allegedly wrongful acts occurred[.]"  *Id.* (internal citation and

quotation omitted).[22]  Second, once the defendant establishes that he was acting within the scope

of his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is

not appropriate."  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal citation and

quotation omitted).  In conducting this second part of the analysis, a court must determine whether

the plaintiff alleged the deprivation of an actual constitutional right and, if so, then determine

---

[22] In this case, as Canizaro was on duty as a courtroom deputy at the JJC, he was acting within
the scope of his discretionary authority.

whether that right was clearly established at the time of the alleged violation. *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Vinyard*, 311 F.3d at 1346.

The determination of whether a constitutional right was clearly established at the time of the incident must be made in the specific context of the case. *Vinyard*, 311 F.3d at 1349. "A right is clearly established if, in light of preexisting law, the unlawfulness of the official's conduct is 'apparent'." *Cooper*, 2005 WL 653313; *Vinyard*, 311 F.3d at 1350 (issue is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). This standard does not require that the particular conduct under scrutiny was previously found to be unlawful. *Id*. Instead, the state of the existing law must only be such that the official had a fair warning that his conduct is unlawful. *Id*; *Harlow*, 457 U.S. at 818 ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.").[23] Summary judgment based on qualified immunity is appropriate if the law at the time of the incident did not put the defendant government official on notice "that his conduct would be clearly unlawful." *Vinyard*, 311 F.3d at 1350.

---

[23] The Eleventh Circuit has identified three categories of legal warning:

First . . . whether the federal statute or constitutional provision is so clear, and the conduct is so bad, that it precludes qualified immunity even in the total absence of case law. Second, if the conduct is not bad enough that it violates a constitutional provision on its face, [a court] look[s] to case law that can be applied broadly to a number of factual situations. Third, and finally, if no broad case law is applicable, [the court] turn[s] to case law precedent that is tied to the facts.

*Kesinger v. Herrington*, 381 F.3d 1243, 1250 n.6 (11th Cir. 2004) (internal citations omitted).

IV.    **Legal Analysis**

A. Probable Cause

The Fourth Amendment encompasses the right to be free from arrest without probable

cause. *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).  In the Eleventh Circuit,

"the standard for determining the existence of probable cause is . . . whether a reasonable man

would have believed [probable cause existed] had he known all of the facts known by the officer."

*Rankin v. Evans*, 133 F.3d 1425, 1433 (11th Cir. 1998) (internal citation and quotation omitted).

For probable cause to exist, the arrest "must be objectively reasonable under the totality of the

circumstances."  *Id*. at 1435.

> This standard is met when the facts and circumstances within the officer's
> knowledge, of which he or she has reasonably trustworthy information, would
> cause a prudent person to believe, under the circumstances shown, that the suspect
> has committed, is committing, or is about to commit an offense.  Probable cause
> requires more than mere suspicion, but does not require convincing proof.

*Id*. (internal citations and quotations omitted); *see also Marx v. Gumbinner*, 905 F.2d 1503, 1506

(11th Cir. 1990) ("Probable cause does not require overwhelmingly convincing evidence, but only

reasonably trustworthy information.") (internal citation and quotation omitted).  The qualified

immunity inquiry is not governed by a standard of "actual" probable cause, but instead by

"arguable probable cause," which "exists if, under all of the facts and circumstances, an officer

reasonably could--not necessarily would--have believed that probable cause was present."  *Crosby*,

394 F.3d at 1332.  An inquiry into probable cause is not judged with clinical detachment, "but with

a common-sense view to the realities of normal life."  *Marx*, 905 F.2d at 1506 (internal citation

and quotation omitted).  Finally, the subjective belief of the arresting officer is not relevant to the

determination of whether probable cause exists.  *Rankin*, 133 F.3d at 1433.

Probable cause constitutes an absolute bar to Section 1983 claims alleging false arrest. *Id*.

at 1435.  On the other hand, "[a] warrantless arrest without probable cause violates the Fourth

Amendment and forms a basis for a section 1983 claim." *Rodriguez v. Farrell*, 280 F.3d 1341,

1345 (11th Cir. 2002).  Thus, to succeed on a Section 1983 claim, the plaintiff bears the burden of

demonstrating the absence of probable cause. *Rankin*, 133 F.3d at 1436.  Whether a particular set

of facts gives rise to probable cause for an arrest depends on the elements of the crime or offense.

*Crosby*, 394 F.3d at 1333.  In this case, Tepper was arrested for violating Florida Statute section

843.02, which provides:

> Whoever shall resist, obstruct, or oppose any officer as defined in s.943.10(1) . . . or
> other person legally authorized to execute process in the execution of legal process
> or in the lawful execution of any legal duty, without offering or doing violence to
> the person of the officer, shall be guilty of a misdemeanor of the first degree . . . .

F.S.A. 843.02.[24]  Thus, to support a conviction under that statute, the state must prove two

elements: "(1) the officer was engaged in the lawful execution of a legal duty; and (2) the action by

the defendant constituted obstruction or resistance of that lawful duty." *Storck v. City of Coral

Springs*, 354 F.3d 1307, 1315 (11th Cir. 2003).  In Florida, it is a crime not only to oppose or

---

[24] Florida Statute section 943.10(1) provides that

"Law enforcement officer" means any person who is elected, appointed, or employed
full time by any municipality or the state or any political subdivision thereof; who is
vested with authority to bear arms and make arrests; and whose primary responsibility
is the prevention and detection of crime or the enforcement of the penal, criminal,
traffic, or highway laws of the state. This definition includes all certified supervisory
and command personnel whose duties include, in whole or in part, the supervision,
training, guidance, and management responsibilities of full-time law enforcement
officers, part-time law enforcement officers, or auxiliary law enforcement officers but
does not include support personnel employed by the employing agency.

obstruct an officer in the execution of that officer's duty, but also to attempt to oppose or obstruct the officer. *Id.* This statute is not limited to situations were an officer is attempting to arrest a suspect; instead, it is "intended to apply to any situation where a person willfully interferes with the lawful activities of the police." *N.H. v. State*, 890 So. 2d 514, 516 (Fla. 3rd DCA 2005). Normally, physical conduct is required to support a conviction. *Francis v. State*, 736 So. 2d 97, 99 (Fla. 4th DCA 1999); *D.G. v. State*, 661 So. 2d 75, 76 (Fla. 2d DCA 1995) (statute normally requires obstructive conduct rather than offensive words).

Canizaro states that he decided to place Tepper under arrest at the time that she "resisted" by "trying to physically pull away, pushing, pulling, trying to defeat [his] effort to get her under control." (Doc. 37 at 32). He also states that he gave Tepper "a lawful order to leave the courtroom," with which he felt she did not comply, so he initiated contact with her, which she resisted.[25] (Id. at 33). Canizaro's assertions in this regard are not persuasive in light of the video

---

[25] *See also* Doc. 37 at 17-21:

> Answer: . . . After several times of telling her to leave that's when I came into the picture and tried to get her to leave. The point when she was not leaving that's when I went ahead after instructing her to leave the courtroom and she didn't leave, that's when I went ahead and secured her arm with a custodial touch.
> Question: Just so I'm clear, it's your testimony that Yolanda Tepper was not leaving the courtroom until you secured her arm with a custodial touch?
> A: Yes, sir. At which time she still didn't leave, she physically resisted.
> Q: How did she physically resist?
> A: By pulling her harm away.
>                                    . . .
> Q: At what point did she yank away from you?
> A: Pretty much as soon as I secured her arm.
>                                    . . .
> Q: . . . Is that your recollection, or did she not turn around to leave before you grabbed her arm?
> A: I believe she did start gathering up her stuff. As I told her to leave I started to get her stuff, too, which I believe is on the videotape. You can say you're leaving all day

evidence which conflicts in substantial measure with Canizaro's testimony, particularly when the evidence is viewed in the light most favorable to Tepper as the non-moving party.

It does not appear that Tepper initially refused to follow the judge's order to leave the courtroom. Although she did ask if she could speak again, as soon as Canizaro approached, she collected her things as if to leave. Canizaro touched her immediately, even prior to speaking with her, and she informed him that she was leaving. Canizaro then gave her the rest of her items from the podium, grabbed her right arm and began moving her toward the door. Tepper did stop and say that Canizaro was hurting her. It does not appear, however, that she pulled or yanked her arm out of Canizaro's grip. Instead, it appears more likely that he released his grip, and thus, contrary to Canizaro's testimony, it does not seem that Tepper engaged in any conduct that could be described as "resisting." And although she appears to stop walking, at that point Canizaro had not

---

long but unless you actually leave -- you can say it all day, it doesn't mean you're leaving. She was given plenty of time to leave.

. . .

Q: So your recollection is that after you secured Yolanda Tepper's arm with a custodial touch, that she pulled away from you and you lost your grip on her arm?
A: After I secured her arm and she pulled away she broke that grip by pulling away.

. . .

Q: Were you able to secure her again?
A: From her top part, shoulders I believe it was, shoulder, side arm somewhere.

. . .

Q: But its your testimony that she was refusing to leave even at that point?
A: Once I secured her to walk her out of the courtroom, escort her out of the courtroom?
Q: Yes, sir.
A: She had already physically refused. And at that point she was taken out of the courtroom because she had already resisted.

. . .

Q: After you lost your grip on her, did she refuse to leave at that point, was she walking out, what was she doing?
A: As soon as she pulled away she still didn't make an effort to leave, but then as soon as she moved away then I went hands-on.

clearly given her a specific order to leave the room.  It was only after he again placed his hands on her and again began pushing her toward the door, that Canizaro clearly stated, for the first time, that he wanted her to leave the courtroom.  After this, it does not appear that she offered any resistance whatsoever as he pushed her toward the door.  Certainly, Tepper's repeated statements that Canizaro was hurting her do not constitute resistance.

These facts do not appear to provide an objectively reasonable basis for Canizaro to arrest Tepper for resisting an officer without violence.[26]  However, the parties dispute whether Tepper's actions constitute resistance.  Where the facts are in dispute, probable cause is a question of fact. *Marx*, 905 F.2d at 1506 (when the facts are not in dispute, whether probable cause existed is a question of law and summary judgment is appropriate); *Perrin v. City of Elberton, Ga.*, 2005 WL 1563530 at *15 (M.D. Ga. July 1, 2005) (question of lack of probable cause is question for jury, and plaintiff must raise evidence creating a question of fact); *Smith v. Vaughn*, 946 F. Supp. 957, 961 (M.D. Fla. 1996) (probable cause is normally a question for jury except when facts are not in dispute).  Because the Court cannot find as a matter of law that Canizaro had probable cause based on undisputed evidence, he is not entitled to qualified immunity on this issue.  *Boone v. City of Montgomery*, 2005 WL 1383179 at *6 (M.D. Ala. June 9, 2005) (where facts do not establish

---

[26] At best, it appears that Tepper, by all appearances a frail elderly woman, simply did not move fast enough for Canizaro's liking, and did not appreciate being manhandled when she was attempting to comply with the judge's order to her.  It appears that Canizaro not only gave no credence to Tepper's complaints of pain, but was impatient and overzealous in his actions.  Canizaro has indicated that he believed Tepper was undermining the judge's authority and was stalling.  That, however, is not the issue.  The issue is whether Tepper was resisting or obstructing Canizaro's efforts to carry out his lawful duty, and the evidence is clearly in dispute as to whether she was.  Accordingly, it appears that Canizaro lacked even arguable probable cause.  *See Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir. 1998) (officer not entitled to qualified immunity where reasonable officer could not have found that plaintiff unlawfully interfered with officer's duties).

arguable probable cause, defendant is not entitled to qualified immunity on claim of unlawful

arrest).

B. Use of Force[27]

The Fourth Amendment "encompasses the right to be free from the use of excessive force

during an arrest." *Crosby*, 394 F.3d at 1333.[28]   The Eleventh Circuit has provided the following

standard of review for excessive use of force cases:

> [T]he 'reasonableness' inquiry in an excessive use of force case is an objective one:
> the question is whether the officer's actions are 'objectively reasonable' in light of
> the facts and circumstances confronting him, without regard to his underlying intent
> or motivation.

*Crosby*, 394 F.3d at 1333.[29]   Courts are "not to view the matter as judges from the comfort and

safety of . . . chambers," but rather "must see the situation through the eyes of the officer on the

---

[27] Although neither side raised the issue, the Court notes that the force about which Tepper complains does not appear to have been used in the course of her arrest, particularly given that she was not actually placed under arrest until several hours after the courtroom incident.  Nevertheless, the same Fourth Amendment analysis applies, because "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original); *see also Robinson v. Arrugueta*, 415 F.3d 1252, 1255 (11th Cir. 2005) ("The Fourth Amendment protects individuals from 'unreasonable' seizures.").  The "word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." *California v. Hodari D.*, 499 U.S. 621, 626 (1991).  It cannot reasonably be disputed that when Canizaro not only touched Tepper, but grabbed her and pushed her toward the door, he had "seized" her within the meaning of the Fourth Amendment.

[28] "The use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." *Rodriguez*, 280 F.3d at 1351.

[29] Because the inquiry is one of objective reasonableness, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Jackson v. Sauls*, 206 F.3d 1156, 1170 (11th Cir. 2000).

scene who is hampered by incomplete information and forced to make a split-second decision

between action and inaction . . . ." *Id.* at 1333-34; *Vinyard*, 311 F.3d at 1347 ("Use of force must

be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather

than with the 20/20 vision of hindsight.") (internal citation and quotation omitted).[30]  Under both

Florida and federal law, "a full custodial arrest is allowed even when the offense is only a

misdemeanor." *Durruthy v. Pastor*, 351 F.3d 1080, 1093 (11th Cir. 2003).  Moreover, both the

Supreme Court and the Eleventh Circuit have "recognized that the right to make an arrest . . .

necessarily carries with it the right to use some degree of physical coercion or threat thereof to

effect it." *Crosby*, 394 F.3d at 1334 (*quoting Graham v. Connor*, 490 U.S. 386, 397 (1989));

*Rodriguez*, 280 F.3d at 1351 ("the typical arrest involves some force and injury.").  However,

when an arrest is unlawful, an officer is not justified in using any force.  *Nolin v. Isbell*, 207 F.3d

1253, 1258 (11th Cir. 2000) (noting that any use of force is inappropriate in cases involving arrests

without probable cause); *Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998).

Qualified immunity applies in excessive force cases "unless application of the standard

would inevitably lead every reasonable officer in [the position of the defendant officer] to

conclude the force was unlawful." *Nolin*, 207 F.3d at 1255 (internal citation and quotation

---

[30] The determination of whether the force applied was reasonably proportionate to the need for that force involves a number of factors, including "the severity of the crime, whether the suspect pose[d] an immediate threat, and whether the suspect [was] resisting or fleeing." *Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997); *Vinyard*, 311 F.3d at 1347.  Using these factors, a court must balance the "necessity of the use of force used against the arrestee's constitutional rights . . . ." *Vinyard*, 311 F.3d at 1347; *see also Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004) (to determine if force was objectively reasonable, courts consider a variety of factors, including "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.") (internal citation and quotation omitted).

omitted).  Therefore, the Eleventh Circuit adheres to the principle that the "application of *de minimus* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."  *Id*. at 1257.

Having determined that it is a question of fact whether Canizaro had probable cause to arrest Tepper, the Court is unable to conclude as a matter of law whether Canizaro was privileged to use force against her.[31]  Therefore Canizaro is not entitled to qualified immunity on Tepper's excessive force claim.[32]

---

[31] However, even assuming that the arrest was lawful, it does not appear that Canizaro would be entitled to qualified immunity regarding his use of force, because the force he applied simply does not appear to have been reasonable.  At the time Canizaro began to touch Tepper, the worst act that Tepper had committed was to ask the judge if she could speak notwithstanding the judge's order for her to go outside.  When Canizaro actually grabbed her, she indicated that she was leaving and that he did not have to force her.  Even if Tepper, an elderly woman, was attempting to resist Canizaro after he finally clearly told her to leave the courtroom (and it does not appear that she was), it simply does not seem reasonable to assume that Canizaro had to apply so much force that she was pushed backwards and fell against the door.  Canizaro never indicated that he believed Tepper posed a threat to himself, the judge or to anyone else in the courtroom, (*see* Doc. 37 at 40), and her alleged crime was certainly not sufficient to warrant the force Canizaro used.  *See Thornton*, 132 F.3d at 1400 (summary judgment was properly denied where officer did not have probable cause to arrest plaintiff and reasonable officer would have recognized that force used was excessive).

[32] In the Eleventh Circuit, "a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim."  *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000).  *See also Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995) (where plaintiff argued that there was no need for application of any force because force was used to accomplish unlawful arrest, damages recoverable on false arrest claim included damages suffered because of use of force in effecting arrest); *Motes v. Myers*, 810 F.2d 1055, 1060 (11th Cir. 1987) (if jury were to find arrest unconstitutional, use of force was unconstitutional and became an element of damages for the Section 1983 violation).  However, the Court cannot determine this issue at present, because the question of probable cause (and thus the lawfulness of the arrest) is a question of fact that remains to be decided.

C. State Law Battery (Count I)

*1) Battery and excessive force in arrest*

Under Florida law, a "battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3rd DCA 1996). Police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest, and officers are only liable for damage where the force used is "clearly excessive." *Id*. Thus, acts which are "no more than ordinary incidents of the arrest . . . do not give rise to an independent tort." *Lester v. City of Tavares*, 603 So. 2d 18, 19-20 (Fla. 5th DCA 1992). However, if an officer uses excessive force during an arrest, the "ordinarily protected use of force . . . is transformed into a battery." *Sanders*, 672 So. 2d at 47. Further, "[w]hen no crime has been committed, this fact weighs heavily in favor of finding the use of force excessive." *Thompson v. Douds*, 852 So. 2d 299, 306 (Fla. 2nd DCA 2003).

*2) Statutory Immunity*

Florida Statute section 768.28(9)(a), which provides that:

[n]o officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Fla. Stat. § 768.28(9)(a). Thus, in order for an officer to be held personally liable under Florida law for an injury resulting from an act the officer committed in the scope of his employment, the

officer must have acted in bad faith, with a malicious purpose, or in a willful and wanton manner.[33]
*See Prieto v. Malgor*, 361 F.3d 1313, 1320 (11th Cir. 2004).

*3) The instant case*

The Court has already determined that it is a question of fact whether Canizaro had probable cause to arrest Tepper, and that it is therefore also a question of fact as to whether the force Canizaro used was reasonable under the circumstances.  Therefore, Canizaro is not entitled to summary judgment on Tepper's state law battery claim, because a question of fact exists regarding the reasonableness of the force Canizaro applied.  *See City of Homestead v. Suarez*, 591 So. 2d 1125, 1126 (Fla. 3rd DCA 1992) (where court rejected defense argument that officer had probable cause for arrest, and determined that even if arrest was valid it would not have justified force used to effect arrest, jury question was presented regarding battery claim); *Cirou v. Basler*, 432 So. 2d 628, 629 (Fla. 3rd DCA 1983) (where evidence supported claim for battery owing to excessive use of force during arrest, case should be submitted to jury).  Further, given Tepper's allegations that Canizaro acted aggressively toward her, and in light of the evidence presented, the Court declines to hold that Canizaro is entitled to statutory immunity under Florida law, and instead concludes that a question of fact exists as to whether Canizaro acted in bad faith, with a malicious purpose, or in a willful and wanton manner.  *See Ondrey v. Patterson*, 884 So. 2d 50, 54 (Fla. 2nd DCA 2004) (based on evidence, question of fact regarding willful or wanton conduct

---

[33] The phrase "wanton and willful" "connotes conduct much more reprehensible and unacceptable than mere intentional conduct." *Maybin v. Thompson*, 514 So. 2d 1129, 1131 (Fla. 2d DCA 1987) (*citing Richardson v. City of Pompano Beach*, 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987)).

under Florida statute § 768.28(9) was properly submitted to jury); *Carestio v. School Bd. of Broward County*, 866 So. 2d 754, 756 (Fla. 4th DCA 2004) (same).

    D. Vicarious Liability (Count II)[34]

    Tepper alleges that Eslinger, as Canizaro's employer, is vicariously liable for any damages arising out of Canizaro's actions.  It is true that "the use of excessive force by an officer in effecting an arrest may render the public employer liable for the intentional torts inflicted thereby." *Hennagan v. Dept. of Highway Safety & Motor Vehicles*, 467 So. 2d 748, 750 (Fla. 1st DCA 1985); *see also Maybin v. Thompson*, 514 So. 2d 1129, 1131 (Fla. 2d DCA 1987) (government may be liable for intentional acts of employees committed during course and scope of their employment).  However, Florida Statute section 768.28(9) provides that the "state or its subdivisions shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed . . . in bad faith or with malicious purpose or in a manner exhibiting wanton and willful

---

[34] This claim necessarily only applies to Tepper's state law battery claim.  As a matter of law, this claim cannot apply to her Section 1983 claim, because municipalities may only be found liable under Section 1983 where the municipality itself causes the constitutional violation at issue.  (*See* n.35, *infra*, noting that the action against Eslinger is presumably in his official capacity, and thus determining that such a suit is functionally equivalent to a suit against the municipality); *City of Canton, Oh. v. Harris*, 489 U.S. 378, 385 (1989).  Respondeat superior and vicarious liability do not attach under Section 1983.  *Id.*  It will not suffice for a plaintiff to identify conduct attributable to the municipality; instead, the plaintiff must demonstrate that, through its deliberate conduct, the municipality "was the 'moving force' behind the injury alleged."  *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404 (1997).  Thus, in order to impose liability on a municipality under Section 1983, a plaintiff must show: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004); see also *Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1116 (11th Cir. 2005) (Section 1983 liability exists only when a policy or custom of the municipality causes the injury, and so a plaintiff must demonstrate a direct causal link between the municipal action and the deprivation of federal rights).  Tepper has made no allegations, and has offered no evidence, that her injuries were caused by some municipal custom or policy.

disregard or human rights, safety, or property."[35] Fla. Stat. § 768.28(9)(a).  Thus, in Florida, "a

governmental entity is liable for all torts, negligent . . . and intentional . . . unless the actor was

acting in bad faith or with a malicious purpose or in a manner exhibiting wanton and willful

disregard of human rights, safety, or property."  *Richardson v. City of Pompano Beach*, 511 So. 2d

1121, 1123 (Fla. 4th DCA 1987); *see also Gomez v. Metro Dade County, Fla.*, 801 F. Supp. 674,

684 n.14 (S.D. Fla. 1992).

Having determined that the issue of whether Canizaro acted in bad faith, maliciously, or

willfully and wantonly is a question of fact, the Court cannot resolve the issue of Eslinger's

vicarious liability for the state law battery claim against Canizaro.  However, if it is determined at

trial that Canizaro acted within the language of Florida Statute 768.28(9)(a), such a finding would

necessarily immunize Eslinger from vicarious liability for those actions.  *See Searer v. Wells*, 837

F. Supp. 1198, 1202 (M.D. Fla. 1993) (if trier of fact determines that the actions undertaken by

officers were in bad faith, with malicious purpose or with wanton and willful disregard for human

rights, the claims against sheriff in his official capacity would be barred under Florida Statute §

768.28(9)); *McGhee v. Volusia County*, 679 So. 2d 729, 733 (Fla. 1996) ("In any given situation

either the agency can be held liable under Florida law, or the employee, but not both;" noting that

---

[35] Suits against government officials in their official capacity are functionally equivalent to direct suits against municipalities. *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991); *see also Cooper v. Dillon*, 403 F.3d 1208, 1221 n.8 (11th Cir. 2005) (suit against defendant in his official capacity as Chief of Police of a municipality was the same as suit against the municipality).  Where a government official is sued in his official capacity, the proper party in interest is the official's employer.  *Abusaid v. Hillsborough County Bd. of County Comm'rs*, 405 F.3d 1298, 1302 n.3 (11th Cir. 2005).  Although Tepper does not specifically refer to Eslinger "in his official capacity," she only refers to him as "Sheriff of Seminole County, Florida," and as Canizaro's employer, and thus the Court presumes this is an action against Eslinger in his official capacity.

question of whether employee's actions fell within language of Florida Statute § 768.28(9) was question of fact); *Carestio*, 866 So. 2d at 756-57.

**V.      Conclusion**

Questions of fact exist regarding whether Canizaro had probable cause to arrest Tepper and whether the force Canizaro applied was reasonable.  Therefore summary judgment is inappropriate at this time, and Canizaro is not entitled to qualified immunity on these issues.  For the same reason, summary judgment is inappropriate on Tepper's state law battery claim, which, in turn, leaves the Court unable to determine whether Eslinger should be subject to vicarious liability. Accordingly, it is

**ORDERED THAT** the Defendants' Motion for Summary Judgment (Doc. 24) is DENIED.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on October 7, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party